## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JEFFREY BAKER, # 32292, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 15-cv-600-JPG |
| | ) | |
| ROBERT HERTZ, JOHN LAKIN, | ) | |
| GARY BOST, DONALD BUNT, | ) | |
| ROBERT HOLLENBACH, | ) | |
| RANDY YOUNG, LT. HILL, | ) | |
| MIRAN THOMPSON, SGT. DOVER, | ) | |
| JODIE COLLMAN, PAUL SARHAGE, | ) | |
| STEVE RIDINGS, | ) | |
| DONALD McNAUGHTON, | ) | |
| KENT GRIFFITH, TIM WALKER, | ) | |
| CRAIG RICHERT, MIKE TASSOME, | ) | |
| MIKE HARE, OFCR. MARK SPURGEON, | ) | |
| BLAKE SELLERS, MARK RYAN, | ) | |
| MATT MILLER, | ) | |
| ROBERT BLANKENSHIP, | ) | |
| MARTHA MAJOR, ALICIA RUSHING, | ) | |
| and VALERIE BASSETS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**GILBERT, District Judge:**

Plaintiff is a pretrial detainee at the Madison County Jail ("the Jail").  He brings this *pro se* civil rights action pursuant to 42 U.S.C. § 1983, raising a number of constitutional claims against the 26 Defendants regarding the conditions of his confinement.  Additionally, he asserts state tort claims of medical malpractice and negligence.  The complaint consists of a 130-page statement of claim, supplemented by numerous exhibits (Doc. 1 contains the caption and list of Defendants; Docs. 6-1 through 6-12 include the statement of claim and exhibits).  In addition, Plaintiff has filed a motion seeking a temporary restraining order ("TRO") and a preliminary

injunction (Doc. 6).  This case is now before the Court for a preliminary review of the complaint pursuant to 28 U.S.C. § 1915A.

The bulk of Plaintiff's pleading consists of a litany of complaints over his medical care. His problems began on June 2, 2014, when Defendant Ryan (a Jail deputy who had no medical training) gave Plaintiff the wrong medication, causing a severe reaction.  Plaintiff's medical needs relating to this "poisoning" have still not been adequately addressed.  Plaintiff claims that Defendant Hertz (the sheriff) is responsible for his injuries, because he promulgated the policy under which non-medical staff distribute medications to inmates when no doctor or nurse is on duty.  Plaintiff later injured his elbow in a fall and has ongoing symptoms.

A second set of claims asserts that various Defendants allowed Plaintiff to be exposed to raw sewage, which flooded the Jail several times between March 2014 and March 2015.  On March 23, 2015, Plaintiff's drinking water supply was murky and contaminated, which made him sick.

Finally, Plaintiff raises several other assorted claims, including:  the meal times at the Jail have caused him hardship, he has been exposed to cold temperatures, he was denied access to a grievance procedure, and was denied access to the courts.

The sheer length of Plaintiff's complaint leads the Court to consider dismissing it for running afoul of the directive of Federal Rule of Civil Procedure 8, which requires "a *short* and plain statement of the claim showing that the pleader is entitled to relief." FED R. CIV. P. 8(a)(2) (emphasis added).  The pleading is anything but short.  However, it is (for the most part) clearly written, legible, plainly labeled with numbered paragraphs and page numbers, and contains the relevant facts underlying Plaintiff's claims.  Therefore, the Court shall review the complaint as presented.

**The Complaint**

The statement of claim begins on page 3 of Doc. 6-1.  Plaintiff recites that he was taking Motrin as prescribed by Defendant Dr. Blankenship, and it caused him to experience heartburn. At 3:30 pm on June 2, 2014, Defendant Ryan (a Jail deputy) brought in the medical cart and gave Plaintiff his prescribed pills.  Plaintiff asked Defendant Ryan if he had any medication to relieve heartburn.  Defendant Ryan said, "I do have this," handing Plaintiff a sealed packet (Doc. 6-1, ¶ 9). Plaintiff tore open the packet and swallowed the contents.  Plaintiff's stomach, mouth, and throat immediately began to burn.  He soon began to vomit uncontrollably, and after about 15 minutes, Plaintiff noticed blood in the vomit.  He had intense stomach cramps and pain in his abdomen and chest.  He was dizzy, light headed, and had hot flashes and cold sweats.  He learned that the package handed to him by Defendant Ryan was labeled "Efferdent" (Doc. 6-1, ¶ 14).  This denture-cleaning substance is not intended to be taken internally.

A week before this incident, Plaintiff had a disagreement with Defendant Ryan involving a signature and notarization of a document.  Plaintiff suggests that Defendant Ryan may have given him the Efferdent in retaliation for Plaintiff's assertion of his rights in that incident; as a prank or practical joke; or with reckless disregard for Plaintiff's health (Doc. 6-2, ¶ 33).

Over the next several hours, Plaintiff told Defendants Spurgeon, Ridings, Thompson, Young, Miller, and Sarhage (all Jail corrections officers) about his symptoms and asked them to summon emergency medical care.  He said he had been poisoned when Defendant Ryan gave him Efferdent, and his chest felt as if somebody was standing on it and stabbing him.  Each of these Defendants failed or refused to get a medical provider to examine or treat Plaintiff, and the symptoms (including the vomiting) continued to grow worse.  Plaintiff drank water, and milk given to him by Defendant Ridings, but he could not keep anything down.  Several Defendants

informed Plaintiff that no medical staff were on duty at the Jail after 2:00 pm. (Doc. 6-1, ¶¶ 15-19, 22-23).

Defendant Thompson placed Plaintiff for a time into an attorney booth for "observation," but did not get him any medical care (Docs. 6-1, 6-2, ¶¶ 23-24).  Defendant Young took Plaintiff back to his cell.  Around 10:00 pm, Defendants Miller and Sarhage took Plaintiff to a segregation cell for "observation," and took away his property.  The cell smelled of human waste and had feces smeared on the walls.  They refused to give Plaintiff a clean drinking cup, soap, toothbrush, or toothpaste (Doc. 6-2, ¶¶ 27-31).

The next day (June 3), Defendant Ryan returned to work and Plaintiff asked him to summon a doctor or ambulance; he refused (Doc. 6-2, ¶ 33).

Plaintiff asserts that Defendant Hertz (Madison County Sheriff) adopted the policy of not having medical staff available for Jail inmates around the clock, and of allowing Jail Deputies (instead of trained and licensed medical providers) to dispense medications to inmates (Doc. 6-1, ¶ 20).  This policy directly led to Plaintiff's injury.

Around 11:30 am on June 3, Plaintiff was taken to see Defendant Dr. Blankenship, who ordered an abdominal x-ray (Doc. 6-2, ¶¶ 35-40).[1]  He had a blood test on June 4 (Doc. 6-2, ¶ 41).  Plaintiff was still vomiting and could not hold down any food.  He was moved to a different segregation cell that was clean.  Defendant McNaughton would not get Plaintiff anything to eat, and he and Defendant Walker refused to summon medical help for Plaintiff after he complained that his chest pain had intensified (Doc. 6-3, ¶¶ 43-44).

On June 5, Plaintiff had a medical consultation with Defendant Nurse Rushing.  She was rude and would not listen to Plaintiff's description of his symptoms.  She said his blood and

---

[1] It appears that Plaintiff either omitted some pages or mis-numbered his paragraphs, as paragraphs 37-38 are missing.

urine tests "weren't that bad" and his x-ray showed only that he was constipated, but she gave him no medication for that condition (Doc. 6-3, ¶ 45).

Plaintiff wrote complaints to Defendants Bunt (Captain) and Bost (Jail Superintendent) over the poisoning, taking of his property, and denial of medical care, but they did not respond (Doc. 6-3, ¶¶ 46-47, 49).   Defendants Hill, Richert, and Hollenbach failed to return Plaintiff's property to him or get him clean clothes, but Defendant Hill eventually returned the items on June 7.

On June 8, Plaintiff did not receive his anxiety/bipolar medications; Defendant Richert said they were not on the medicine cart.   On June 10, the nurse stated they were in fact on the cart (Doc. 6-3, ¶ 51).   Plaintiff concludes that Defendant Richert intentionally deprived him of the medications as retaliation.

On June 10, Plaintiff saw Defendant Nurse Bassets, but she never addressed any of his medical concerns, and failed to refer him to the doctor despite her promise to do so (Doc. 6-3, ¶¶ 52-54).   Plaintiff had lost 30 pounds by June 18.   Defendant Nurse Major and Defendant Nurse Rushing likewise refused to refer Plaintiff to the doctor, and failed to evaluate his symptoms or provide testing or treatment (Docs. 6-3, 6-4, ¶¶ 55-59).   Defendant Major (on orders from Defendant Blankenship) also took away one of Plaintiff's medications (Saraquil) and replaced it with Desorel, which causes Plaintiff to have the side effect of restless leg syndrome (Doc. 6-3, ¶ 55).   Plaintiff complains generally that the medical Defendants have a policy of failing to notify inmates when a medication will be switched or why.   Defendants McNaughton, Schmidt, Walker, and Spurgeon ridiculed Plaintiff over the Efferdent incident (Doc. 6-4, ¶¶ 60, 63-64, 66, Doc. 6-5, ¶ 82-83).

Plaintiff continued to suffer symptoms including headaches, chest and kidney pains,

fatigue, dizziness and light-headedness, and numbness in his hands and feet.  On August 1, 2014, he blacked out while walking in the hallway for exercise (Doc. 6-4, ¶ 65).  He fell and injured his right elbow.  Plaintiff blacked out and fell a second time on August 14, 2014, hurting his right elbow again.  He saw Defendant Major for this injury; she ordered x-rays, and medications for pain and allergies (Doc. 6-4, ¶ 67).  Defendant Rushing told Plaintiff the x-rays were negative, and denied his requests for an MRI, EKG, CT scan, and other tests for his ongoing symptoms (Doc. 6-4, ¶ 68).  Defendant Walker prematurely terminated Plaintiff's sick call visit to Defendant Rushing on September 4 (Doc. 6-5, ¶¶ 72-73).  He then harassed Plaintiff when he returned to the nurse the next day, having learned of Plaintiff's complaint over the first incident (Doc. 6-5, ¶ 75).  Defendant Rushing again failed to render any medical care to Plaintiff.

On September 8, Defendant Bassets ordered another x-ray for Plaintiff's elbow and gave him two Tylenols for his headache.  However, she did not further examine him or check his vital signs, or agree to order the many tests Plaintiff requested (Doc. 6-5, ¶ 78).  She suggested Plaintiff should see a neurologist and gastric specialist after he is released (Doc. 6-5, ¶ 79).  He sent another sick call request to see the doctor for his headaches that "never go away" and his other symptoms.  He saw a nurse on September 9 but nothing was done.  He estimates he had lost 40 or 50 pounds by the time of that visit, as he weighed in at 216 pounds (Doc. 6-5, ¶ 84).

Plaintiff again wrote complaints to Defendants Bunt and Bost regarding the lack of treatment for the symptoms he had been suffering since taking the Efferdent.  He detailed his symptoms and said that most of them have been ignored by the medical staff at the Jail.  He wanted to see specialists now rather than wait until his release (Doc. 6-5, ¶¶ 81-82, 85).  Defendants Bunt and Bost never responded.  Plaintiff further claims that he has notified Defendant Hertz of the failure of the medical staff to address his needs, but these administrative

Defendants have ignored him and failed to comply with state law requirements to have a functional grievance procedure (Doc. 6-5, ¶ 86).

On September 18, Plaintiff saw Defendant Bassets again, explaining that he continued to have frequent intense headaches, occasional kidney pain, swelling/bruising and excruciating pain in his injured elbow, severe chest pain, dizziness, frequent nausea and abdominal cramps, ear pain, and involuntary twitching of his head (Doc. 6-5, ¶ 87). She said she would talk to the doctor, but provided him with no care.

On October 4, Plaintiff again requested a sick call visit because his headache had become more intense and painful than ever. On October 6, the deputy who distributed medications gave Plaintiff a blue pill that he had never seen before. He had a jail officer ask the nurse what it was, and she confirmed it was not intended for Plaintiff. Over the next several days, Plaintiff continued to ask for help for his headaches, ear pain, and elbow pain, but was told that he had to go through the doctor to obtain any care. He saw Defendant Bassets on October 13; she told him that he had a bone spur on his elbow that was caused by the fall, and it could only be repaired with surgery. However, the Jail would not provide surgery unless his arm locked up. At Plaintiff's insistence, she examined his right ear that had been causing him pain for weeks, and found that it was full of drainage. She told him the ear needed to be irrigated, and that he would get a temporary dose of Tramadol for his headaches, but did not provide either treatment (Doc. 6-6, ¶¶ 89-91).

On October 24, 2014, Plaintiff saw Defendant Majors for the above problems, as well as new symptoms (cough, runny nose, and congestion) he was having since the cell area was contaminated with raw sewage (Doc. 6-6, ¶ 91). She issued Plaintiff antibiotics and Mucinex, but said she could do nothing about his elbow. She performed the ear irrigation, and told him

that his non-stop headaches were most likely caused by central nervous system damage from taking the Efferdent. She did nothing about his chest pain and headaches.

On December 28, 2014, Plaintiff saw Defendant Nurse Rushing after he had been in contact with raw sewage for 24 hours, without any water or means to sanitize his hands before eating. She did nothing to address his complaints of vomiting, stomach cramps, headaches, chest pains, and continued bruising and swelling of his elbow (Doc. 6-6, ¶ 94).

Plaintiff complains that Defendant Doctor Blankenship has failed to order any tests or procedures to check Plaintiff's heart, chest pains, stomach problems, or other symptoms despite his repeated reports of these ongoing painful problems and requests for medical care (Doc. 6-6, ¶ 96). Plaintiff attaches a number of documents describing the possible injuries that may be caused by ingesting Efferdent (Doc. 6-7).

More recently, on April 19, 2015, Plaintiff was again given the wrong medication, this time by Defendant Walker (Doc. 6-6, ¶ 98). Instead of taking it, Plaintiff asked what it was. Defendant Walker told him it was Motrin, then said it was Prilosec. When Plaintiff insisted he check, Defendant Walker learned it was Percardia, which had not been prescribed for Plaintiff.

The next section of the complaint describes several occurrences of raw sewage flooding into Plaintiff's housing area in the Jail. He faults Defendants Bost, Bunt, Hertz, and Lakin for failing to remedy this problem (Doc. 6-8, ¶¶ 99-100). On March 18, 2014, Plaintiff was housed on Cellblock B-North. Between that date and May 12, 2014, raw sewage would back up through the drains and flood the walkways, cells, and dayroom, sometimes for 3-4 days out of the week. Plaintiff was forced to come into direct contact with the waste when he had to walk through it to get meal trays. Detainees are not given socks, so they wear rubber sandals on their bare feet. The sandals rubbed on Plaintiff's skin, causing open sores which were exposed to the germs in

the sewage.  The sewage residue was never properly cleaned from the Jail's living area after the floods subsided, and Plaintiff was not given adequate supplies to sanitize the area.  Plaintiff complained about these conditions to Defendants Bost, Bunt, Hertz, and other Jail staff, to no avail.

From August 25, 2014, through September 2014, raw sewage would continually back up through the shower drains and sometimes spray up into the air, causing Plaintiff to come into direct contact with it each time he would shower.  At one point, about four inches of waste backed up in the shower while Plaintiff was standing in it.  He suffered headaches, abdominal cramps/pain, vomiting, loss of appetite, and nausea from the smell of human waste.  Plaintiff and other inmates complained to Defendants Bost and Bunt, but they did not correct the problem (Doc. 6-5, ¶ 85; Doc. 6-8, ¶ 101).  Defendants Hare and Coleman[2] (Jail Deputy and Sergeant) saw the backup of waste when Plaintiff was showering, but left Plaintiff exposed to the raw sewage.

On September 17, 2014, the toilets began gushing raw sewage, until the entire cell block was covered with four-inch-deep waste (Doc. 6-8, ¶ 102).  Plaintiff again came in contact with it while trying to save his property from destruction, and had to walk through the sewage in his bare (sandaled) feet.  Defendants Ryan, Sellers, and/or Spurgeon had the water supply turned off and gave the inmates squeegees and a mop to sweep the waste to drain holes in the officers' walkway, but did not provide gloves or other protective gear, or anything to sanitize the area.  Plaintiff had no water to drink or to clean the waste off his hands before eating.  Later, Defendant Sellers turned the water back on, but this caused the toilets to again overflow with raw sewage.  Several hours later, after a repair attempt was made, the water was turned on again, causing the

_____

[2] In the body of the complaint, Plaintiff refers to this Defendant as "Jodie Coleman," however, in the list of Defendants, he spells the name as "Jodie Collman." The Court will refer to both spellings, as it appears the allegations are against a single individual.

toilets to gush raw sewage for the third time that day.  Defendant Miller helped Plaintiff and other detainees to remove the waste, and brought bleach water to sanitize the area.  He did not give them any gloves or protective gear, and Plaintiff had to wade through the sewage again. The sewage smell as well as the bleach fumes sickened Plaintiff.  Some of his property, including irreplaceable family photographs, was destroyed in the flood.  Following this incident, Defendant Major gave Plaintiff antibiotics and Mucinex, but did not examine or test him for any of the many diseases he could have contracted from the sewage exposure (Doc. 6-9, ¶ 103).

On December 27, 2014, there was another eruption of sewage from the cell toilets, which flooded the entire cell block as before.  Defendant McNaughton let one prisoner out of his cell to clean up the hallway, but Plaintiff remained locked in his cell without any means to remove the raw sewage that was several inches deep.  Plaintiff swept some of it out with pieces of cardboard, but had no way to clean his hands as the water was shut off.  Defendant McNaughton brought food trays, but refused to give Plaintiff access to water or hand sanitizer before eating. Plaintiff became ill and vomited.  The cells flooded with sewage again later that day.  Defendants Dover and Tassome refused to clean debris from the drains so the material could drain out of the cells, prolonging Plaintiff's exposure to the human waste.  Defendant Griffith, under orders from Defendant Dover, left Plaintiff on lockdown, refused to restore the water, and denied requests for cleaning supplies or bottled water (Doc. 6-9, ¶ 104).  Defendant Richert gave Plaintiff his daily medication, but nothing to drink so he could swallow it.  After 24 hours, the water was restored, but it was murky and smelled bad.

On March 11, 2015, a flood occurred in B-South, which filled Plaintiff's unit (B-North) with toxic fumes.  Plaintiff could not use the shower or toilet due to the problem.  A week later, on March 18, the toilets in Plaintiff's cellblock again flooded the area with raw sewage.

Defendants Sarhage, Ridings, and Hill did not give Plaintiff adequate materials to clean or sanitize the mess (Doc. 6-9, ¶ 107).  At that time, Defendant Lakin was the sheriff; he and Defendant Bost knew of the recurring problem but disregarded the hazards and failed to correct it.

The next day (March 19) the same thing happened; Plaintiff was in direct contact with sewage for about an hour and a half before Defendant Hill brought some cleaning supplies (Doc. 6-9, ¶ 109).  Another sewage overflow occurred on April 26, 2015.  Defendant Hollenbach swept the waste into Plaintiff's cell, and refused to get bleach to clean the area (Doc. 6-10, ¶ 111).  The walls in the cell area have never been cleaned after the sewage backups, are growing mold, and are still contaminated.

On March 23, 2015, the Jail's water, including drinking water, was discolored and did not clear up for several days.  Plaintiff drank some to take his medicine and became sick (Doc. 6-10, ¶ 110).

The complaint then turns to Plaintiff's claim that he is being abused by excessively long periods between the dinner and breakfast meals at the Jail.  He states that the 14-1/2 hour gap between dinner at 4:30 pm and breakfast at 7:00 am causes fights, bullying, and extortion among the inmates (Doc. 6-10, ¶ 114).  In addition to the meal schedule policy, Defendants Hertz and Lakin keep the Jail's temperature too cold.  They have failed to provide a grievance procedure for inmates (Doc. 6-11, ¶ 116).  Prisoners have not been separated as required by state law, such that Plaintiff and other detainees have been housed together with convicted criminals (Doc. 6-11, ¶ 117).  In May 2014, Plaintiff was moved at his request due to problems with such cellmates.  Defendant McNaughton took Plaintiff's toilet paper, toothbrush, and soap during the move, and he was deprived of these items for seven days, leaving him with nothing but his own t-shirt to

wipe himself after using the toilet.

Plaintiff suffered cuts on two occasions from the Jail's broken electric razor that inmates share. Defendants McNaughton, Dover, and Sarhage failed to provide Plaintiff with antiseptic and first aid items (Doc. 6-11, ¶ 120-33). Defendant Nurses Major, Rushing and Bassets failed to properly maintain the razor. Plaintiff complained about this problem over several months and had several other close calls when he avoided injury.

Next, Plaintiff complains that the Jail's law library is inadequate and he is given too little time to use it. He is indigent and has not been given stamps or envelopes, which has impeded his attempts to get legal representation and to file his complaint. In May 2014, he was not able to get Defendant Hollenbach to notarize documents as required to submit a claim regarding money forfeitures (Doc. 6-11, ¶ 134). Another officer ultimately notarized the papers, but Plaintiff never got his money, and states he has been permanently deprived of the $600 cash that was the subject of one claim (Doc. 6-12, p. 6).

The complaint does not contain a distinct request for relief, but Plaintiff includes a diagram of his injuries and continuing pain in various parts of his body, stating that he wants to receive tests and treatment for these symptoms (Doc. 6-12, p. 3).

**The Motion for TRO/Preliminary Injunction (Doc. 6)**

In this motion, Plaintiff seeks immediate medical tests, procedures, and treatments for the various physical problems he has suffered since taking the Efferdent, including his severe persistent chest pains, kidney and abdominal pain, cramping, seizures, and intense headaches. In particular, he wants care from a neurologist and "gastrologist" as suggested by the medical Defendants, and surgery to repair his injured right elbow, which is still painful, swollen, and continues to develop bruises many months after the injury. He has never been tested for the

many diseases he might have contracted from his repeated contact with raw sewage.

He also seeks an order to halt the Jail policy that allows untrained deputies to distribute medications to inmates.  Finally, he requests an order requiring the Jail to upgrade its law library, notarial services, photocopies, and access to the courts.

## Merits Review Pursuant to 28 U.S.C. § 1915A

Under § 1915A, the Court is required to conduct a prompt threshold review of the complaint, and to dismiss any claims that are frivolous, malicious, fail to state a claim on which relief may be granted, or seek monetary relief from an immune defendant.

Based on the allegations of the complaint, the Court finds it convenient to divide the pro se action into the following counts.  The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court.  The designation of these counts does not constitute an opinion as to their merit.

> **Count 1:**  Defendant Ryan gave Plaintiff Efferdent tablets to take internally for his heartburn, with deliberate indifference to the risk of harm to Plaintiff from using the product in this way;
>
> **Count 2:**  Defendant Ryan intentionally gave Plaintiff Efferdent tablets to take internally for his heartburn, in retaliation for Plaintiff's complaint about his need to have a document notarized and Defendant Ryan's refusal to sign a statement for him; and on June 8, Defendant Richert withheld his anxiety/bipolar medications in retaliation;
>
> **Count 3:**  Defendants Spurgeon, Ridings, Thompson, Young, Miller, Sarhage, McNaughton, Walker, and Ryan refused to obtain any medical care or examination for Plaintiff after he ingested the Efferdent, despite his persistent vomiting and complaints of severe pain;
>
> **Count 4:**  Defendants Hertz and Lakin promulgated and continue the policy of directing Jail deputies with no medical training to distribute medication to inmates, which led to the incident described in Counts 1-3 as well as other instances of improper medication being offered to Plaintiff;
>
> **Count 5:**  Defendants Sarhage and Miller kept Plaintiff in a cell contaminated with feces for two days after the Efferdent poisoning and deprived Plaintiff of his

personal hygiene items and other personal property; Defendants Richert and Hill refused or delayed the return of these property items;

**Count 6:** Defendants Rushing, Blankenship, Major, and Bassets have been, and continue to be, deliberately indifferent to Plaintiff's serious medical needs, including the severe vomiting and pain after taking Efferdent; the elbow injuries; his ongoing headaches, chest and other pain; his earache; and his exposure to raw sewage;

**Count 7:** Defendants Rushing, Blankenship, Major, and Bassets were negligent and/or committed medical malpractice when they failed to adequately treat Plaintiff's medical needs, including the severe vomiting and pain after taking Efferdent; his elbow injuries; his ongoing headaches, chest and other pain; his earache; and his exposure to raw sewage;

**Count 8:** Defendants Bost, Bunt, Hertz, and Lakin failed to provide a functional grievance procedure at the Jail, and failed to respond to Plaintiff's complaints over the conditions;

**Count 9:** Defendants Bost, Bunt, Hertz, and Lakin failed to correct the recurring plumbing/drainage problems at the Jail, causing Plaintiff to come in contact with raw sewage on many occasions, and depriving him of a water supply during the sewage floods;

**Count 10:** Defendants Bost, Bunt, Hare, Collman/Coleman, Ryan, Sellers, Spurgeon, McNaughton, Dover, Tassone, Griffith, Richert, Ridings, Sarhage, Hill, and Hollenbach allowed Plaintiff to be exposed to raw sewage, failed to provide cleaning supplies or protective gear for the cleanup, failed to provide Plaintiff with water for personal hygiene and consumption, and failed to clean the sewage residue and mold which still contaminate Plaintiff's living area;

**Count 11:** Defendants Hertz and Lakin placed Plaintiff at risk with their policy that requires him and other detainees to go without food between the 4:30 pm dinner meal and the 7:00 am breakfast meal;

**Count 12:** Defendants Hertz, Lakin, Bost, and Bunt subjected Plaintiff to unreasonably cold conditions in the Jail;

**Count 13:** Defendant McNaughton deprived Plaintiff of toilet paper, toothbrush, and soap for seven days in May 2014, leaving him unable to meet his basic hygiene needs;

**Count 14:** Defendants Rushing, Major, Bassets, McNaughton, Dover, Ridings, and Sarhage placed Plaintiff's health at risk by failing to maintain the communal electric razor or provide Plaintiff with first aid supplies after he suffered cuts, and Defendants Bost and Bunt failed to respond to Plaintiff's complaints over the

problem;

**Count 15:** Defendants Bost, Bunt, Hertz, and Lakin denied Plaintiff access to the courts by failing to maintain an adequate law library and restricting Plaintiff's use of the library;

**Count 16:** Defendant Hollenbach denied Plaintiff access to the courts when he refused to notarize the document that Plaintiff was required to timely file in order to contest the forfeiture of his cash and/or property;

**Count 17:** Defendants McNaughton, Schmidt, Walker, and Spurgeon caused Plaintiff mental anguish when they verbally ridiculed him over the Efferdent incident.

Accepting Plaintiff's allegations as true, the Court finds that all or part of Counts 1-6, 9, 10, 13, and 16 survive threshold review under § 1915A; these Counts shall proceed for further consideration. Counts 7, 8, 11, 12, 14, 15, and 17 shall be dismissed, for the reasons discussed below. Any additional claims not specifically mentioned herein should be considered dismissed without prejudice.

## Fourteenth Amendment Conditions of Confinement Claims by Pretrial Detainees

The Due Process Clause of the Fourteenth Amendment governs claims for unconstitutional conditions of confinement and denial of medical care brought by pretrial detainees; most of Plaintiff's claims in this action (Counts 1, 3-6, and 9-14) fall under one of these two categories. *See Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012); *Forest v. Prine*, 620 F.3d 739, 744-45 (7th Cir. 2010); *Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008). The Eighth Amendment governs claims for convicted prisoners. *Id.*

Pretrial detainees are afforded "*at least* as much protection as the constitution provides convicted prisoners," *Board v. Farnham*, 394 F.3d 469, 477-78 (7th Cir. 2005) (emphasis in original) (internal quotations and citations omitted). The Seventh Circuit has generally applied

the same standards to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoners). *Id.* Thus, for "cruel and unusual punishment" claims brought by a detainee, the plaintiff must show that the jail officials knew that the plaintiff was at risk of serious harm, and that they disregarded that risk by failing to take reasonable measures to abate it.[3] *Grieveson v. Anderson*, 538 F.3d 763, 771-72, 777-79 (7th Cir. 2008); *see also Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

## Count 1 – Wrong Medication

The complaint suggests two alternative theories of liability for Defendant Ryan's action of giving him Efferdent tablets to take internally, in response to Plaintiff's request for heartburn medication such as Tums or Rolaids. Count 1 encompasses the claim that Defendant Ryan was deliberately indifferent to the risk of harm to Plaintiff's health from ingesting a chemical product that was not intended for consumption. There is an objectively serious risk of poisoning from such an incident. As to Defendant Ryan's subjective intent when he gave the tablets to Plaintiff, mere negligence will not support a constitutional claim for deliberate indifference. *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 764-65 (7th Cir. 2002). Rather, a defendant must have been aware of the risk of harm and intentionally disregarded it, or acted with the equivalent of criminal recklessness. *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012); *Minix v.*

---

[3] In *Kingsley v. Hendrickson*, __U.S.__, No. 14-6368, 2015 WL 2473447 (June 22, 2015), the Supreme Court ruled just days ago that a pretrial detainee's Fourteenth Amendment due process claim regarding the use of excessive force turned on the objective reasonableness of the use of force, and proof as to the defendants' mental state was not required. *Id.* at *5. However, the high court specifically declined to decide whether such an objective standard might suffice in a case involving mistreatment of a detainee, as the defendants in that case did not dispute that they had acted purposefully or knowingly. Nevertheless, the *Kingsley* Court noted that an objective standard had been applied in *Bell v. Wolfish*, 441 U.S. 520, 541-43 (1979), relative to a variety of prison conditions, including double-bunking. *Kingsley*, 2015 WL 2473447 at *5-6. *Bell* did not specifically state that an objective standard applied; rather, the *Kingsley* Court characterized the "rationally related" and "appears excessive in relation to a legitimate nonpunitive governmental purpose" standards as being objective. Plaintiff's complaint herein has alleged both the objective and subjective factors with respect to the claims that survive threshold review.

*Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010).

Further factual development will be necessary in order to determine whether Defendant Ryan's actions amounted to unconstitutional deliberate indifference or otherwise subjected Plaintiff to unconstitutional conditions of confinement.  Accordingly, **Count 1** shall proceed for further review.

## Count 2 – Retaliation Claims

Plaintiff's second theory of liability against Defendant Ryan is that he purposely gave Plaintiff the Efferdent, knowing that it was not in fact a heartburn remedy, in retaliation for Plaintiff's insistent attempts to have a document notarized.  Plaintiff had complained about the failure of another official (Defendant Hollenbach) to respond to his requests for notary services, and asked that Defendant Ryan sign the document himself or verify that Defendant Hollenbach had refused to do so.  Plaintiff alleges that Defendant Ryan may have retaliated against him for raising this complaint, or may have given him the Efferdent as a prank or joke as a consequence for their disagreement.

Jail officials may not retaliate against inmates for filing grievances or otherwise complaining about their conditions of confinement; the right to raise complaints is protected by the First Amendment.  *See, e.g.*, *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012); *Walker v. Thompson*, 288 F.3d 1005 (7th Cir. 2002); *DeWalt v. Carter*, 224 F.3d 607 (7th Cir. 2000); *Babcock v. White*, 102 F.3d 267 (7th Cir. 1996); *Cain v. Lane*, 857 F.2d 1139 (7th Cir. 1988).  At issue here is whether Plaintiff experienced an adverse action that would likely deter First Amendment activity in the future, and if the First Amendment activity was "at least a motivating factor" in the Defendant's decision to take the retaliatory action.  *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009).  At the pleading stage, Plaintiff's retaliation claim against Defendant

Ryan in **Count 2** merits further review.

However, the retaliation claim against Defendant Richert for withholding Plaintiff's prescribed anxiety/bipolar medicine on June 8, 2014, fails to survive § 1915A scrutiny. Plaintiff makes a bald assertion that Defendant Richert took this action "in retaliation" – but fails to identify any protected activity on his part that might have triggered the supposed retaliatory act. Without making this connection, Plaintiff has not properly pled a retaliation claim. *See Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002). Accordingly, the portion of **Count 2** that involves Defendant Richert shall be dismissed without prejudice.

## Count 3 – Denial of Medical Care after Poisoning

In the hours and days following his ingestion of the Efferdent tablets, Plaintiff made Defendants Spurgeon, Ridings, Thompson, Young, Miller, Sarhage, McNaughton, Walker, and Ryan aware of his severe vomiting (which included apparent blood in the vomit), abdominal cramps and pain, severe chest pain, dizziness, and sweating. He asked them to get emergency medical care for him. His symptoms grew worse. However, each of these Defendants refused or failed to summon a medical provider to examine Plaintiff or treat his painful symptoms.

A medical need is "serious" for deliberate indifference purposes where it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997). Plaintiff's allegations meet that objective standard. He has also stated that he made each of these Defendants aware of his serious medical condition, yet they intentionally disregarded the risk of harm. **Count 3** shall accordingly proceed against Defendants Spurgeon, Ridings, Thompson, Young, Miller, Sarhage, McNaughton, Walker, and Ryan.

**Count 4 – Policy of Medication Distribution by Non-Medical Staff**

In order to obtain relief against a municipality, a plaintiff must allege that the constitutional deprivations were the result of an official policy, custom, or practice of the municipality. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also King v. Kramer*, 680 F.3d 1013, 1020-21 (7th Cir. 2012) (municipality was on notice that health-care provider's policies were "causing problems at the jail"); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006). When a plaintiff sues an individual such as a county sheriff in his official capacity, the suit is treated as if the plaintiff has sued the municipality itself. *Pourghoraishi*, 449 F.3d at 765.

Here, Plaintiff sues the former and current Sheriffs of Madison County, Defendants Hertz and Lakin, whom he alleges promulgated and/or continued the policy and practice of relying on Jail staff, who had no medical training, to dispense prescription and other medications to inmates, in the absence of oversight by a nurse or doctor. He claims that his poisoning with Efferdent, as well as other examples where he was given potentially harmful incorrect medication but did not take it, were the direct result of this policy/practice. The Court will construe this claim against Defendants Hertz and Lakin, which at this time seeks only injunctive relief, as being brought against the Sheriffs in their official capacity. **Count 4** shall also proceed for further review.

**Count 5 – Contaminated Cell**

Shortly after the Efferdent poisoning, Defendants Sarhage and Miller put Plaintiff into a segregation cell that was contaminated with feces and the odor of human waste, and kept him there for two days for "observation." They took away his soap, toothbrush, and toothpaste, and refused to give him a clean drinking cup. It is not clear how long he was deprived of these

necessary personal hygiene items while in the contaminated cell.  He had to continue wearing the same soiled clothing for several days.  Plaintiff also complains that he was deprived of other personal property such as his Bible, writing materials, and addresses for five days, despite asking Defendants Richert and Hill to return all of his property.  Defendant Hill did ultimately return the property a few days after Plaintiff's request to him.

Unsanitary conditions similar to those described by the Plaintiff here have been found to state a claim under the Eighth Amendment's "cruel and unusual punishment" clause.  *See Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007) (prisoner held in cell for three to six days with no working sink or toilet, floor covered with water, and walls smeared with blood and feces); *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (summary judgment improper where inmate alleged he lived with "filth, leaking and inadequate plumbing, roaches, rodents, the constant smell of human waste, . . . [and] unfit water to drink[.]"); *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989) (inmate held for three days in cell with no running water and feces smeared on walls).  As Plaintiff is a pretrial detainee, he should not be subjected to any punishment.  *See Bell v. Wolfish*, 441 U.S. 520, 538 (1979).

At this stage, Plaintiff's claim against Defendants Sarhage and Miller for placing him in the unsanitary cell without personal hygiene items and clean clothing, and against Defendants Richert and Hill for withholding these items, shall proceed in **Count 5**.  However, the temporary deprivation of his other non-hygiene-related property items does not appear to rise to the level of a constitutional violation.  That portion of Count 5 is dismissed without prejudice.

## Count 6 – Deliberate Indifference to Serious Medical Needs – Doctor and Nurses

To state a claim for deliberate indifference to medical needs, a detainee must show that (1) he suffered from an objectively serious condition which created a substantial risk of harm,

and (2) the defendants were aware of that risk and intentionally disregarded it. *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010); *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 764-65 (7th Cir. 2002).

An objectively serious medical condition includes an ailment that significantly affects an individual's daily activities or which involves chronic and substantial pain. *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). "Deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. Delaying treatment may constitute deliberate indifference if such delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (internal citations and quotations omitted). Medical negligence or even malpractice, however, does not violate the Constitution. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008); *Jackson*, 300 F.3d at 764-65; *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001).

Plaintiff did receive x-rays after the Efferdent incident and his elbow injury, and was given a blood test after taking the Efferdent. However, he was not treated for the persistent vomiting, abdominal pain, or chest pain he suffered after ingesting the Efferdent. Further, he outlines a history of persistent symptoms that suggest the presence of several serious medical conditions – severe chest pain, intense headaches, kidney pain, fatigue, nausea, dizziness (which led to the fall where he injured his elbow), numbness in his extremities, and significant weight loss, for which Plaintiff was given little or no treatment or diagnostic evaluation. He did receive treatment for his painful ear condition, but that medical attention was delayed and only offered after Plaintiff insisted on an examination of the problem that he had been suffering from for some time already. The complaint sufficiently states a claim against Defendants Rushing,

Blankenship, Major, and Bassets for denial/delay of medical care for these ailments, which shall proceed for further consideration under **Count 6**.  In addition, Defendants Lakin and Bost, who appear to be the current Sheriff and Jail Administrator, shall remain as parties with respect to Count 6, for the purpose of implementing any injunctive relief to which Plaintiff may be entitled. *See Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (proper defendant in a claim for injunctive relief is the government official responsible for ensuring any injunctive relief is carried out).

Further, Plaintiff's repeated exposure to raw sewage appears to have presented an objectively serious risk to his health.  Defendant Majors gave him antibiotics and Mucinex on one occasion (October 24), thus Plaintiff does not state a cognizable claim against her on that matter.  However, Nurse Rushing offered no medical assistance after the incident on December 28, 2014; Plaintiff may also proceed on this claim against her as part of Count 6.

## Dismissal of Count 7 – Negligence/Malpractice

This claim is based on the same factual allegations as the constitutional claim in Count 6. Where a district court has original jurisdiction over a civil action such as a § 1983 claim, it also has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367(a), so long as the state claims "derive from a common nucleus of operative fact" with the original federal claims.  *Wisconsin v. Ho-Chunk Nation,* 512 F.3d 921, 936 (7th Cir. 2008).  "A loose factual connection is generally sufficient."  *Houskins v. Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008) (citing *Baer v. First Options of Chicago, Inc.,* 72 F.3d 1294, 1299 (7th Cir. 1995)).  While this Court has supplemental jurisdiction over these state-law claims pursuant to 28 U.S.C. § 1367, this is not the end of the matter.

Under Illinois law, a Plaintiff "[i]n any action, whether in tort, contract or otherwise, in

which the plaintiff seeks damages for injuries or death by reason of medical, hospital, or other healing art malpractice," must file an affidavit along with the complaint, declaring one of the following: 1) that the affiant has consulted and reviewed the facts of the case with a qualified health professional who has reviewed the claim and made a written report that the claim is reasonable and meritorious (and the written report must be attached to the affidavit); 2) that the affiant was unable to obtain such a consultation before the expiration of the statute of limitations, and affiant has not previously voluntarily dismissed an action based on the same claim (and in this case, the required written report shall be filed within 90 days after the filing of the complaint); or 3) that the plaintiff has made a request for records but the respondent has not complied within 60 days of receipt of the request (and in this case the written report shall be filed within 90 days of receipt of the records).  *See* 735 ILL. COMP. STAT. §5/2-622(a) (West 2013).[4] A separate affidavit and report shall be filed as to each defendant.  *See* 735 ILL. COMP. STAT. §5/2-622(b).

Failure to file the required certificate is grounds for dismissal of the claim.  *See* 735 ILL. COMP. STAT. § 5/2-622(g); *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000).  However, whether such dismissal should be with or without prejudice is up to the sound discretion of the court.  *Sherrod*, 223 F.3d at 614.  "Illinois courts have held that when a plaintiff fails to attach a certificate and report, then 'a sound exercise of discretion mandates that [the plaintiff] be at least afforded an opportunity to amend her complaint to comply with section 2-622 before her action

---

[4] The August 25, 2005, amendments to a prior version of this statute were held to be unconstitutional in 2010.  *Lebron v. Gottlieb Mem. Hosp.*, 930 N.E.2d 895 (Ill. 2010) (Holding P.A. 94-677 to be unconstitutional in its entirety).  After *Lebron*, the previous version of the statute continued in effect.  *See Hahn v. Walsh*, 686 F. Supp. 2d 829, 832 n.1 (C.D. Ill. 2010).  The Illinois legislature re-enacted and amended 735 ILL. COMP. STAT. §5/2-622 effective January 18, 2013 (P.A. 97-1145), to remove any question as to the validity of this section.  *See* notes on Validity of 735 ILL. COMP. STAT. §5/2-622 (West 2013).

is dismissed with prejudice.'" *Id.*; *see also Chapman v. Chandra*, Case No. 06-cv-651-MJR, 2007 WL 1655799, at *4-5 (S.D. Ill. June 5, 2007).

In the instant case, Plaintiff has failed to file the necessary affidavits or reports. Therefore, the claim in Count 7 shall be dismissed.  However, the dismissal shall be without prejudice at this time, and Plaintiff shall be allowed 35 days from the date of entry of this order, in which to file the required affidavits/reports.  If Plaintiff timely complies with the statutory requirements, the Court shall consider reinstating this claim in the action.

**Dismissal of Count 8 – Grievance Procedure**

The Constitution does not require a jail to provide a grievance procedure for inmates to register their complaints.  *See Maust v. Headley,* 959 F.2d 644, 648 (7th Cir. 1992); *Shango v. Jurich*, 681 F.2d 1091, 1100-01 (7th Cir. 1982).  Even if a grievance procedure may be  required under state law, this does not provide grounds to bring a claim in federal court.  A federal court does not enforce state law and regulations.  *Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988) (en banc), *cert. denied,* 489 U.S. 1065 (1989); *Pasiewicz v. Lake Cnty. Forest Preserve Dist.*, 270 F.3d 520, 526 (7th Cir. 2001).  Because grievance procedures are not constitutionally mandated, the failure to have such a procedure or to comply with one if it does exist, does not implicate the Due Process Clause per se.  Further, the alleged mishandling of grievances "by persons who otherwise did not cause or participate in the underlying conduct states no claim."  *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011).  *See also Grieveson v. Anderson*, 538 F.3d 763, 772 n.3 (7th Cir. 2008); *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996).

Plaintiff alleges that Defendants Bost, Bunt, Hertz, and Lakin failed to provide a working grievance procedure, and did not respond to his complaints.  This does not state a distinct

constitutional claim against these Defendants, thus **Count 8** shall be dismissed with prejudice.

## Count 9 – Failure to Correct Unsanitary Conditions

Whether or not Defendants Bost, Bunt, Hertz, and Lakin were present in the cell block during the raw sewage overflows, Plaintiff has alleged that these Defendants had knowledge of the recurring sewage backups and lack of water supply, and that they are the responsible parties to take measures to mitigate the problems with the drainage and plumbing systems. He claims that they did not take reasonable or effective steps to prevent the risk of harm to his health, and as a result, he suffered repeated exposure to raw sewage, without the means to clean his cell or his body. The lack of water to drink during these episodes further deprived Plaintiff of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). At this stage of the case, the complaint is sufficient to warrant further review of the claims in **Count 9**.

## Count 10 – Failure to Mitigate Effects of Sewage/Plumbing Problems

A number of Defendants are alleged to have been on duty in Plaintiff's cell block during or soon after the various sewage backups. In some instances, these Defendants failed to take any action to help Plaintiff clean his body or his cell; at other times, the measures were inadequate to deal with the contamination. Some Defendants' actions prolonged or even increased Plaintiff's exposure to the sewage. According to Plaintiff, the living area is still contaminated because the sewage residue and mold have never been cleaned. Plaintiff was also deprived of drinking water during these events. The objective risks to Plaintiff's health and safety from such exposure and lack of water are obvious and excessive. As such, Plaintiff may proceed on his claims in **Count 10** against Defendants Bost, Bunt, Hare, Collman/Coleman, Ryan, Sellers, Spurgeon, McNaughton, Dover, Tassone, Griffith, Richert, Ridings, Sarhage, Hill, and Hollenbach.

**Dismissal of Count 11 – Duration Between Meals**

In the prison context, the denial of food is not a *per se* violation of the objective component of an Eighth Amendment claim.  The Seventh Circuit has held that a district court "must assess the amount and duration of the deprivation," in order to determine whether it was sufficiently serious to implicate constitutional concerns.  *Reed v. McBride*, 178 F.3d 849, 853 (7th Cir. 1999).  *See generally Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (it would be an Eighth Amendment violation to deny a prisoner an "identifiable human need such as food"); *Talib v. Gilley*, 138 F.3d 211, 214 n.3 (5th Cir. 1998) (noting that denial of one out of every nine meals is not a constitutional violation); *Cooper v. Sheriff of Lubbock Cnty.*, 929 F.2d 1078 (5th Cir. 1991) (failure to feed a prisoner for twelve days is unconstitutional); *Cunningham v. Jones*, 567 F.2d 653, 669 (6th Cir. 1977), *app. after remand*, 667 F.2d 565 (1982) (feeding inmates only once a day for 15 days, would constitute cruel and unusual punishment only if it "deprive[s] the prisoners concerned . . . of sufficient food to maintain normal health.").  This guideline as to the objective seriousness of an alleged food deprivation may likewise be applied in the case of a pretrial detainee.

Plaintiff has not alleged that he has suffered any physical ill-effects due to the length of time he must wait between his 4:30 pm meal and his breakfast meal, and he clearly is receiving three meals per day.  He raises only vague safety concerns over the potentially threatening behavior of fellow detainees, and cites no example where he (or anybody else) actually suffered any harm.  As pled, the complaint fails to suggest that Plaintiff has experienced an objectively serious deprivation of food.  **Count 11** shall therefore be dismissed without prejudice.

**Dismissal of Count 12 – Cold Conditions**

To assess whether cold cell temperatures constitute cruel and unusual punishment, courts

must consider factors including "the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *See Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997); *see also Palmer v. Johnson*, 193 F.3d 346 (5th Cir. 1999) (finding that exposure to extreme cold for 17 hours could constitute Eighth Amendment violation); *Henderson v. DeRobertis*, 940 F.2d 1055, 1058 (7th Cir. 1991) (finding that deprivation of blankets for four days in extreme cold could constitute Eighth Amendment violation).

Recognizing that these Eighth Amendment cases do not apply directly to a pretrial detainee, who should not be subjected to any punishment, they may still serve as a yardstick to evaluate whether the objective conditions are sufficiently serious to implicate constitutional concerns. The only problem Plaintiff describes herein is that his feet are cold because of the low temperatures, which are designed to retard the growth of mold and bacteria, and that he is not given socks. Even in a claim brought by a detainee, the adage *de minimis non curat lex* applies with the same force in civil rights litigation as in any other tort action. *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). As described by Plaintiff, the cold temperatures in the Jail do not suggest a deprivation of constitutional magnitude. Thus, **Count 12** shall be dismissed without prejudice.

## Count 13 – Deprivation of Necessary Personal Hygiene Items (May 2014)

This claim arose before the Efferdent-related claims, and involves only Defendant McNaughton. Plaintiff was moved to a new cell upon his request, and his toilet paper, soap, and toothbrush were taken. He had to go without these items for seven days, during which he had to use an article of clothing to wipe himself after having his bowel movements. These conditions

suggest a deprivation of basic necessities sufficient to support a Fourteenth Amendment claim, thus **Count 13** may proceed.

## Dismissal of Count 14 – Electric Razor

This claim is based on Plaintiff's allegations that various Defendants failed to maintain and/or repair the electric razor that was used by numerous inmates.  Plaintiff suffered minor lacerations, was not given first aid supplies, and feared possible exposure to diseases that might have been carried by other inmates who used the razor.  However, he also describes an incident where another inmate cut himself using the razor, and it was confiscated in order to be sanitized. The facts outlined by Plaintiff do not suggest that he suffered any actual harm of constitutional magnitude.  Further, the Defendants' actions sound in negligence, which will not support a constitutional claim.  **Count 14** shall thus be dismissed without prejudice.

## Dismissal of Count 15 – Inadequate Law Library

"[T]he mere denial of access to a prison law library or to other legal materials is not itself a violation of a prisoner's rights; his right is to access *the courts*, and only if the defendants' conduct prejudices a potentially meritorious challenge to the prisoner's conviction, sentence, or conditions of confinement has this right been infringed."  *Marshall v. Knight*, 445 F.3d 965, 968 (7th Cir. 2006).

Where the record shows that an inmate has filed motions and pleadings with the court, and cannot show any hindrance to his ability to pursue a meritorious claim, a claim cannot be maintained for denial of access to the court.  See *United States v. Sykes*, 614 F.3d 303, 311 (7th Cir. 2010) (finding no deprivation of court access when defendant filed three motions to dismiss).  To state a claim, a plaintiff must explain "the connection between the alleged denial of access to legal materials and an inability to pursue a legitimate challenge to a conviction,

sentence, or prison conditions," *Ortiz v. Downey*, 561 F.3d 664, 671 (7th Cir. 2009) (internal quotation and citation omitted); *accord Guajardo Palma v. Martinson*, 622 F.3d 801, 805-06 (7th Cir. 2010).

In the instant case, Plaintiff has identified several shortcomings with the law library's resources and his ability to access them.  However, he succeeded in filing his lengthy pleading, and the complaint does not reveal that he has suffered any prejudice with respect to bringing the instant action.  *See Kincaid v. Vail*, 969 F.2d 594, 603 (7th Cir. 1992), *cert. denied*, 506 U.S. 1062 (1993) (to state a claim, a prisoner must show actual substantial prejudice to specific litigation). Therefore, he has not stated a claim upon which relief may be granted for denial of access to the courts in **Count 15**.  This claim will be dismissed without prejudice.

## Count 16 – Denial of Access to the Courts – Forfeiture Claims

In contrast to Count 16, Plaintiff states that he was indeed harmed by Defendant Hollenbach's refusal to notarize the document Plaintiff was required to submit in order to reclaim his money/property that was subject to forfeiture.  He says that he permanently lost at least $600.00 because he was unable to file the notarized document on time.  Accordingly, Plaintiff may proceed with his access-to-courts claim against Defendant Hollenbach in **Count 16**.

## Dismissal of Count 17 – Verbal Harassment

This claim is based on several incidents where Defendants joked or mocked Plaintiff about taking the Efferdent tablets, which he states caused him mental distress.  "[H]arassment, while regrettable, is not what comes to mind when one thinks of 'cruel and unusual' punishment."  *Dobbey v. Ill. Dep't of Corrections*, 574 F.3d 443, 446 (7th Cir. 2009).  *See also Dewalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) ("Standing alone, simple verbal harassment

does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws"). While the Court does not condone these unprofessional and insensitive comments, these incidents do not rise to the level of constitutional violations. **Count 17** therefore shall be dismissed without prejudice.

**Pending Motions**

Plaintiff's motion for recruitment of counsel (Doc. 3) is referred to the United States Magistrate Judge for further consideration. Two other motions (Docs. 11 and 14) seek to add exhibits demonstrating Plaintiff's attempts to recruit counsel on his own. These motions are **GRANTED.** The Clerk is **DIRECTED** to add the documents submitted along with Docs. 11 and 14 as exhibits to the motion for recruitment of counsel at Doc. 3.

In Doc. 6, Plaintiff requests both a TRO and a preliminary injunction, to address three matters: 1) medical treatment for the many ailments he has described (see Counts 1, 2, and 6); 2) ending the policy/practice of allowing Jail staff with no medical training to dispense medication to inmates (see Count 4); and 3) upgrading the Jail's law library, notary and photocopy services, and access to the courts in general (see Counts 15 and 16). Because Count 15 shall be dismissed without prejudice, the injunctive relief Plaintiff seeks in relation to that count shall not be considered.

As to the TRO portion of Doc. 6, a TRO is an order issued without notice to the party to be enjoined that may last no more than 14 days. FED. R. CIV. P. 65(b)(2). A TRO may issue without notice *only* if:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

FED. R. CIV. P. 65(b).  Without expressing any opinion on the merits of any of Plaintiff's other claims for relief, the Court concludes that a TRO should not issue in this matter.  Plaintiff's allegations do not set forth specific facts demonstrating the likelihood of immediate and irreparable harm *before Defendants can be heard*.

Therefore, the portion of Doc. 6 that requests a TRO is **DENIED**.  However, the part of the motion that seeks preliminary injunctive relief shall **REMAIN PENDING**, and is hereby **REFERRED** to the United States Magistrate Judge for further consideration, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).  The Magistrate Judge shall resolve the request for injunctive relief as soon as practicable, and issue a report and recommendation.  Any motions filed after the date of this Order that relate to the request for injunctive relief or seek leave to amend the complaint are also hereby **REFERRED** to the Magistrate Judge.

The motion for service of process at government expense (Doc. 4) is **GRANTED.** Service shall be ordered below.

The motion to add additional evidence and supporting facts (Doc. 7), and the motion to admit evidence (Doc. 12) are **DENIED** without prejudice.  Doc. 7 relates to the claim in Count 4 and to the motion for preliminary injunctive relief, and includes new factual allegations not contained in the complaint.  The motion at Doc. 12 similarly contains additional facts beyond what Plaintiff stated in the complaint.   Both motions were accompanied by additional documentation that Plaintiff desires to add to the exhibits he has already filed.

The motions at Doc. 7 and Doc. 12 represent improper attempts to add to or modify the factual allegations in the complaint in a piecemeal fashion.  Further, it is not necessary to submit voluminous exhibits at the pleading stage of a lawsuit.  Plaintiff may re-submit his exhibits at an appropriate time, if they are relevant to a motion or pending claim.  If Plaintiff wishes to modify

or augment the factual allegations in his complaint, he must do so by filing an amended complaint in accordance with Federal Rule of Civil Procedure 15 and Local Rule 15.1.   The amended complaint must contain *all* the relevant allegations supporting each claim that remains in the action, because an amended complaint supersedes and replaces the original complaint, rendering the original complaint void.   *See Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 n.1 (7th Cir. 2004).   An amended complaint must stand on its own, without reference to any other pleading.   All new material in the pleading must be underlined.   If Plaintiff chooses to submit an amended complaint, it must present each claim in a separate count as designated by the Court above.

**<u>Disposition</u>**

**COUNTS 7, 11, 12, 14, 15, and 17** are **DISMISSED** without prejudice for failure to state a claim upon which relief may be granted.   **COUNT 8** is **DISMISSED** with prejudice for failure to state a claim upon which relief may be granted.   Portions of **COUNTS 2 and 5** are **DISMISSED** without prejudice as detailed above.

**IT IS FURTHER ORDERED** that as to the medical malpractice/negligence claims in the dismissed **COUNT 7**, if Plaintiff wishes to seek reinstatement of these claims, he shall file the required affidavits pursuant to 735 ILL. COMP. STAT. §5/2-622, within 35 days of the date of this order (on or before **August 5, 2015**).   Further, Plaintiff shall timely file the required written report(s) of a qualified health professional, in compliance with §5/2-622.   Plaintiff must timely file the required affidavits or reports before the Court will consider any reinstatement of **COUNT 7** in this action.

In reference to **COUNTS 1-6, 9, 10, 13, and 16**, which remain in the action, the Clerk of Court shall prepare for Defendants **HERTZ, LAKIN, BOST, BUNT, HOLLENBACH,**

**YOUNG, HILL, THOMPSON, DOVER, COLLMAN/COLEMAN, SARHAGE, RIDINGS, McNAUGHTON, GRIFFITH, WALKER, RICHERT, TASSOME, HARE, SPURGEON, SELLERS, RYAN, MILLER, BLANKENSHIP, MAJOR, RUSHING,** and **BASSETS**:  (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons).  The Clerk is **DIRECTED** to mail these forms, a copy of the complaint, a copy of the Motion for Preliminary Injunction (Doc. 6), and this Memorandum and Order to each Defendant's place of employment as identified by Plaintiff.  If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that Defendant, and the Court will require that Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

With respect to a Defendant who no longer can be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address.  This information shall be used only for sending the forms as directed above or for formally effecting service.  Any documentation of the address shall be retained only by the Clerk.  Address information shall not be maintained in the court file or disclosed by the Clerk.

Plaintiff shall serve upon Defendants (or upon defense counsel once an appearance is entered), a copy of every pleading or other document submitted for consideration by the Court.  Plaintiff shall include with the original paper to be filed a certificate stating the date on which a true and correct copy of the document was served on Defendants or counsel.  Any paper received by a district judge or magistrate judge that has not been filed with the Clerk or that fails to include a certificate of service will be disregarded by the Court.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

Pursuant to Local Rule 72.1(a)(2), this action is **REFERRED** to a United States Magistrate Judge for further pre-trial proceedings, which shall include determinations on the pending motion for recruitment of counsel (Doc. 3), and motion for preliminary injunctive relief (Doc. 6).

Further, this entire matter shall be **REFERRED** to the United States Magistrate Judge for disposition, pursuant to Local Rule 72.2(b)(2) and 28 U.S.C. § 636(c), *if all parties consent to such a referral.*

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under § 1915, Plaintiff will be required to pay the full amount of the costs, notwithstanding that his application to proceed *in forma pauperis* has been granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Plaintiff is **ADVISED** that at the time application was made under 28 U.S.C. § 1915 for leave to commence this civil action without being required to prepay fees and costs or give security for the same, the applicant and his or her attorney were deemed to have entered into a stipulation that the recovery, if any, secured in the action shall be paid to the Clerk of the Court, who shall pay therefrom all unpaid costs taxed against Plaintiff and remit the balance to Plaintiff. Local Rule 3.1(c)(1).

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **7 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action

for want of prosecution.  *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED: July 1, 2015**

_s/J. Phil Gilbert_
United States District Judge